UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RIK LINEBACK, Regional Director | ) | |
| of the Twenty-fifth Region of the | ) | |
| National Labor Relations Board, | ) | |
| for and on behalf of the | ) | |
| NATIONAL LABOR RELATIONS BOARD, | ) | CASE NO. 1:07-cv-0599-DFH-TAB |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPURLINO MATERIALS, LLC, | ) | |
| | ) | |
| Respondent. | ) | |

ENTRY ON PETITION FOR INJUNCTION

Section 10(j) of the National Labor Relations Act ("NLRA") authorizes the National Labor Relations Board ("the Board") to petition a district court for injunctive relief pending final resolution of an unfair labor practice charge. 29 U.S.C. § 160(j). Congress enacted section 10(j) as part of the Labor Management Relations Act of 1947 (better known as the Taft-Hartley Act) to address cases in which Board procedures can take so long that the Board's remedies become ineffective. See *Kinney v. Pioneer Press*, 881 F.2d 485, 487-88 (7th Cir. 1989) (reviewing legislative history of § 10(j) and companion provision for preliminary injunctions against unions in § 10(*l*)).

In this case the Board's Regional Director seeks injunctive relief on several unfair labor practice charges pending against defendant Spurlino Materials, LLC, which produces and sells ready-mix concrete in the Indianapolis area, among other markets. The charges arise from Spurlino's disputes with the union newly elected to represent the ready-mix truck drivers and the plant operators/batchmen employed at its Indianapolis area concrete plants. An administrative law judge ("ALJ") has conducted a hearing for the Board on the underlying unfair labor practices charges but has not yet ruled. Final resolution of those charges by the Board could easily be months or more in the future.

The court has before it the record of the hearing before the Board's ALJ, additional evidence relevant to the Director's request for injunctive relief, and the parties' briefing. The court heard oral arguments on June 22, 2007. This opinion sets forth the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 65. As explained in detail below, the Director has shown a sufficient likelihood that Spurlino engaged in at least several of the charged unfair labor practices in violation of federal labor law. The Director has introduced substantial evidence that the company acted intentionally to punish publicly the principal union organizers for their activities and to modify terms and conditions of employment unilaterally. The effect and intent have been to show all employees in the bargaining unit that the newly-elected union could not deliver any improvement in wages and working conditions.

The Director has also shown that relief under § 10(j) is, in the terms of the statute, "just and proper" because the company's actions have had substantial effects in discouraging union activity and demoralizing the unionized employees. That relief will include an injunction prohibiting Spurlino from:  (1) retaliating against union leaders and members, through discriminatory job assignments or otherwise; (2) acting unilaterally to change terms and conditions of employment for those in the bargaining unit; (3) failing and refusing to bargain in good faith with the union; and (4) in any like manner interfering with, restraining, or coercing employees' exercise of their rights under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, pending final resolution of the unfair labor practice charges.[1]

I.      *Applicable Law*

Section 10(j) of the National Labor Relations Act provides:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is

---

[1]The Director has recently expressed concern about the delay in the court's decision.  See Docket No. 29.  The court reminds the Director that he filed his petition on May 11, 2007 expressing the need for "immediate" relief and "expedited consideration."  On May 14th, the next business day, the court scheduled a hearing for May 17th and ordered Spurlino to file a written response no later than May 16th.  On May 15th, however, the Director asked to delay that immediate hearing (without opposition from Spurlino).  The court accommodated that request but also cautioned that it would not treat the case more urgently than the Director did and could not be confident that it would be immediately available at the convenience of the Director.  See Docket No. 13.

alleged to have occurred or wherein such person resides or transacts
business, for appropriate temporary relief or restraining order.  Upon the
filing of any such petition the court shall cause notice thereof to be served
upon such person, and thereupon shall have jurisdiction to grant to the
Board such temporary relief or restraining order as it deems just and
proper.

29 U.S.C. § 160(j).  An injunction under § 10(j) is an "extraordinary remedy," one

that should "be granted only in those situations in which the effective enforcement

of the NLRA is threatened by the delays inherent in the NLRB dispute resolution

process."  *Szabo v. P\*I\*E Nationwide, Inc.*, 878 F.2d 207, 209  (7th Cir. 1989).  At

the same time, after the Board has exercised its prosecutorial discretion to bring

a case under § 10(j), the Director need not show "serious and extraordinary

circumstances," but only that injunctive relief is, in the terms of the statute, "just

and proper."  *Pioneer Press*, 881 F.2d at 493; accord,  *NLRB v. Electro-Voice, Inc.*,

83 F.3d 1559, 1567 (7th Cir. 1996).

In *Electro-Voice*, the Seventh Circuit laid out detailed instructions for

handling requests for injunctive relief under § 10(j).  The court's opinion spelled

out a four-part test for § 10(j) relief drawn from the general standards for motions

for preliminary injunctions:

First, the Director must show that she has no adequate remedy at law.
[*Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386-87 (7th
Cir. 1984).]  In other words, she must show that an award of damages
would be "seriously deficient."  *Id.*  Second, the Director must demonstrate
that "public harm" would result absent the injunction.  *P\*I\*E Nationwide*,
878 F.2d at 210.  Third, the Director must show that the labor effort would
be irreparably harmed absent the injunction, and that the irreparable harm
outweighs any irreparable harm to the employer.  *Roland Machinery Co.*,

749 F.2d at 386-87.  * * *  The fourth requirement is that the Director show that she has some likelihood of succeeding on the merits – that she has a "better than negligible" chance of winning.  *Id.* at 387.  Once the Director establishes some likelihood of success, "the court must then determine how likely that success is, because this affects the balance of relative harms. . . . The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor. . . ."  *Id.* at 387.  In other words, a strong showing by the Director of likely success on the merits can offset a weak showing of harm.

83 F.3d at 1567-68; accord, *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286

(7th Cir. 2001).   The court allocated the burden of proof as follows:

The Director must satisfy the first two requirements by a preponderance of the evidence.   The Director must also show irreparable harm by a preponderance of the evidence.   However, the Director need not demonstrate that the harm to the labor effort outweighs the harm to the employer if the Director makes a strong showing under the fourth requirement.

*Electro-Voice*, 83 F.3d at 1568.

One important legal issue here is how to approach disputed factual issues, and there are many in this case.  Before the ALJ, the witnesses for the Board's general counsel testified that Spurlino management had manipulated work assignments to punish publicly the senior drivers who have led the unionizing effort and the collective bargaining.   Spurlino's witnesses denied that they had done any such thing.   The ALJ heard testimony over five days and has not yet issued findings of fact.  This court has read that entire record and has also heard some additional live testimony most relevant to the need for injunctive relief.  As

to those matters addressed in live testimony before the court, the court has performed the usual task of evaluating credibility and making findings of fact.[2]

The problem specific to § 10(j) concerns the merits of the charges addressed in evidence before the ALJ.  Should the district court make its own findings of fact, should it defer to the Board's view of the evidence, or should it take some intermediate approach?  The Seventh Circuit addressed the problem in *Kinney v. Pioneer Press* and held that the district court need not decide separately whether the Board has "reasonable cause" to believe a violation has occurred; the court should consider only whether injunctive relief is "just and proper."  881 F.2d at 488-89 & n.1.  The "just and proper" analysis under *Pioneer Press*, however, still presents the same problem because likelihood of success on the merits is an essential element of that analysis.   See *id.* at 493-94.   *Pioneer Press* also recognized that the Board's role in exercising its discretion affirmatively to request injunctive relief under § 10(j) tends to weigh in favor of some degree of deference toward the Board's view of the case.   *Id.* at 489-90 (explaining holding that "reasonable cause" is not separate element of court's analysis).

In *Electro-Voice*, the Seventh Circuit did not directly resolve the issue of deference toward the Board's view of the facts, see 83 F.3d at 1567 n.16, but provided helpful instruction.  The Seventh Circuit's exposition of the facts shows

---

[2]In the administrative hearing before the ALJ, the Board's general counsel acted as the moving party.  Before this court, the Board's regional director is the party petitioning for injunctive relief.

that the critical facts were hotly disputed.  See *id.* at 1563-65 (noting employer's denials of the charged conduct).  The district court had found that the Board had failed to prove violations by a preponderance of the evidence.  After the district court had ruled, the Board's ALJ issued findings of fact to the effect that the general counsel had proved all but one of the charged violations.  See *id.* at 1566.  On appeal, the Seventh Circuit reviewed the evidence in detail, recognizing that both sides had strong evidence and that courts do not have jurisdiction to decide the merits of the unfair labor charges.  *Id.* at 1568-72.  Recognizing that the Board's general counsel had presented substantial evidence to the ALJ, even though it was contradicted, the Seventh Circuit held that the Board had shown a "better than negligible" chance of success on the merits of the various charges.  *Id.* at 1570, 1571, and 1572.  Because the Board had shown a "better than negligible" chance of success, the district court needed to evaluate all of the equitable factors, including the strength of the Board's case.  *Id.* at 1568.  The Seventh Circuit also explained that the district court had erred by stepping away from resolving disputed issues that depended on evaluations of credibility, even as between witnesses who testified only before the ALJ.  *Id.* at 1571.  In light of the overall strength of the Board's case on both the merits and the need for injunctive relief to prevent irreparable harm to an organizing effort, the Seventh Circuit reversed and remanded for entry of injunctive relief.  *Id.* at 1575.

In *Francisco Foods*, the Seventh Circuit revisited the problem in another case in which the district court heard no additional evidence.  The Seventh Circuit

concluded that in such a case, the courts "owe the Director a favorable construction of the evidence, much as we would if he were a plaintiff appealing the grant of summary judgment in favor of the defendant."  276 F.3d at 287 & n.9 (reversing denial of relief under § 10(j) and ordering relief).

In this case, the Board's general counsel presented to the ALJ substantial evidence of unfair labor practices by the employer, as set forth below.  The central factual issue is whether Spurlino management manipulated job assignments to punish the senior drivers who supported the union effort.

With respect to job assignments, the general counsel supported the charge of manipulation with testimony from drivers who supported the union and were victims (Eversole, Stevenson, and Bales).  That evidence is not surprising, of course, but that evidence is strongly bolstered by testimony from drivers who benefitted from the manipulation and who were either opposed to the union effort (Kiefer and Cox) or neutral to the union effort (Mooney).  Spurlino's manipulation of job assignments was clear to all the drivers who testified, and the selection of the union leaders for punishment was evident to all.  As noted, management denied the manipulation and retaliation, but that evidence is not unimpeachable.[3]

_____

[3]Spurlino manager Gary Matney was a key witness for Spurlino, and his credibility is central to the merits of the charges.  He adamantly denied manipulation of the job assignments.  The transcript of testimony before the ALJ indicates that during Matney's testimony, Mary Rita Weissman, the company's consultant who led the effort to defeat the union and then led the fruitless collective bargaining for the company, was actually whispering answers for
(continued...)

The senior drivers who were union leaders received much less of the premium work on the stadium project than would be expected absent manipulation aimed against them.  When Spurlino decided to set up a portable plant on the stadium site, management manipulated the information given to the drivers (about effects on seniority) so as to discourage the union leaders from applying.  Management accommodated those favored drivers who did most of the stadium work.  The Board's general counsel also presented substantial evidence that Spurlino had unilaterally changed terms and conditions of employment for the employees in the bargaining unit.   The general counsel also presented substantial evidence of management's hostility to the union effort.  Though there is some dispute about a few specific details, there is no doubt that Spurlino management was hostile to the union effort.  That hostility is not illegal in itself, but it is relevant in evaluating the other evidence.  See *Electro-Voice*, 83 F.3d at 1570 (viewing evidence as a whole).

II.    *Findings of Fact*

In light of *Francisco Foods* and *Electro-Voice* and the foregoing discussion, the following findings of fact are based upon a careful review of the administrative record and the additional evidence presented to this court.  If this court owes the Director a "favorable reading" of the evidence as if the employer had moved for

---

[3](...continued)
Matney's benefit.  Tr. 103.  A little while later, consultant Weissman went so far as to answer a question directed to witness Matney.  Tr. 120.

summary judgment, as *Francisco Foods* teaches, then this case is easy on the merits.  The evidence presented by the Board's general counsel provides ample support for findings that Spurlino has engaged in the unfair labor practices.  On the other hand, because this court has heard some additional evidence (but on equitable issues rather than the merits), there might be room to argue that such deference is not required.  To take the more conservative approach, the court's findings of fact on the merits do not reflect deference to the Director's interpretation of the evidence, but reflect instead this court's independent assessment of the weight and credibility of the available evidence.  See *Electro-Voice*, 83 F.3d at 1567-68.  With respect to issues addressed only before the ALJ, these findings are intended to be only tentative.  This court did not have the benefit of seeing the live testimony presented to the ALJ and does not have jurisdiction to decide the merits of the unfair labor practice charges.  Where the court has weighed conflicting evidence for the purpose of evaluating the strength of the Board's case, the court has indicated as much.

Spurlino produces and sells ready-mix concrete in the Indianapolis area, among other markets.  It has three Indianapolis-area plant locations:  Linden, Indiana; Noblesville, Indiana; and Kentucky Avenue in Indianapolis, Indiana.  Its business offices are located at the Kentucky Avenue facility.  Spurlino, which is based in Ohio, acquired these assets in November 2005 from American Concrete Company.  Spurlino apparently hired all or nearly all of the employees who had been working for American Concrete.

After the acquisition, Spurlino employees petitioned for a union representation election.  Prior to the election, Spurlino management campaigned hard to discourage votes for a union.  The general counsel came forward with substantial evidence from drivers that managers Gary Matney, Jeff Davidson, and George Gaskin met one-on-one with drivers to warn them that if the employees voted for a union, things were going to get "ugly" at the company.  *E.g.*, Tr. 418, 513, 516, 577-78, 667.[4]  Matney tried to convince Eversole to launch a petition to revoke the request for the election.  Tr.  412-13.  Matney told Terry Mooney (who was neutral as to the union) that if the employees voted for a union, company owner Jim Spurlino would drag out the negotiations and would pay any fines the company might incur.  Tr. 600.  Matney made similar comments to union supporter Bales.  Tr. 667.

On January 13, 2006, the ready-mix truck drivers and the plant operators/batchmen at Spurlino's Indianapolis plants voted in a secret ballot election conducted by the National Labor Relations Board.  A majority voted to be represented by the Coal, Ice, Building Material and Supply Drivers, Heavy Haulers, Warehousemen, and Helpers Local Union No. 716, an affiliate of the International Brotherhood of Teamsters.   Management and its anti-union consultants were furious.  See Tr. 420 (after vote, consultant said: "They all lied.

---

[4]Matney denied that he made such comments.  Tr. 806-07.  In evaluating the strength of the Director's case under section 10(j), the court has taken into account the fact that the drivers who offered such testimony included not only union supporters but also those who opposed the union or were neutral.

All these mother f*****s voted yes."); 423-24 (Eversole's description of management's reaction to the vote); 516-17 (Cox's account of Matney's reaction).

The Board certified the union as the employees' exclusive collective bargaining representative. There are approximately 35 employees in the bargaining unit. Approximately 15 are drivers who work from Spurlino's Kentucky Avenue facility. Spurlino drivers Ron Eversole and Matt Bales are the only employees now on the union's bargaining committee. (Driver Gary Stevenson had been on the bargaining committee, but Spurlino suspended him in August 2006 and fired him in February 2007.) Spurlino and the union started to negotiate their first labor contract in February 2006. These negotiations have made little progress over the past eighteen months. As of June 2007, the last formal bargaining session had been in January 2007. That track record is consistent with the management's warnings to drivers before the vote.

The specific disputes in this case center on how Spurlino assigns work to truck drivers. Spurlino ordinarily dispatches ready-mix concrete drivers to work assignments based on their position on a call list maintained by Spurlino. A driver's position on the call list is based on his seniority. The seniority list dates back to the operation of American Concrete Company. After the acquisition, Spurlino continued to maintain the call list and dispatched drivers in the same order. For example, at all relevant times, Ron Eversole has been first on Spurlino's call list as the most senior driver at the Kentucky Avenue facility. He

is dispatched first on any given work day.  At the beginning of the work day, the dispatcher moves down the call list until all drivers have been dispatched at least once.  After drivers deliver their first loads of the day and return to the facility, they are dispatched to other jobs on a first-back, first-out basis.  (The evidence shows that there are rare exceptions to this practice, such as where a particular truck could not handle the particular kind of concrete needed, or where a customer insisted that a particular driver not deliver to that customer.)

In December 2005, Spurlino was awarded a contract to provide ready-mix concrete to the new football stadium under construction in downtown Indianapolis.  The stadium project appears to have been Spurlino's largest customer in Indianapolis in 2006 and continued to be a major project through the first half of 2007.  See Tr. 90.  Construction work on the stadium project is covered by the Project Labor Agreement For Work Stabilization for Stadium and Convention Center Expansion Construction ("PLA").  To provide concrete for the stadium project, Spurlino was required to become a party to the PLA and to abide by its terms when performing work on the stadium.  The union is also a party to the PLA.

Under the PLA, Spurlino drivers have received a higher wage and more generous benefits for work on the stadium project than they have received for work for other Spurlino customers.  As a result, Spurlino drivers have wanted to be assigned to work on the stadium project.  The method by which Spurlino

-13-

assigned drivers to the stadium project determined who would benefit from the higher wages under the PLA.

The Board's general counsel has come forward with substantial evidence that Spurlino manipulated the job assignments to punish Eversole, Stevenson, and Bales for their union activities by denying them assignments to the stadium project. According to the general counsel's evidence, Spurlino dispatched Eversole to lower-paying assignments for the first five weeks of the stadium project. When Eversole returned from those assignments, Spurlino disregarded its "first-back, first-out" policy and dispatched other drivers to the stadium project out of order so that Eversole would not get the assignment. Spurlino also skipped over (or "loaded around") Stevenson and Bales – the other two drivers who were most visibly active in the Union to prevent them from working on the stadium with the higher wages and benefits. Spurlino has denied that it manipulated the dispatching.

Recognizing that the issue is disputed and that the ALJ will have to decide the factual questions in the first instance, the court finds that the Board has made a very strong case on this key issue. Most important, the complaints of Eversole, Stevenson, and Bales (who were numbers one, four, and five on the seniority list) were corroborated by other drivers who either opposed the union or were neutral. See Tr. 477-78 (Kiefer); 520-21 (Cox); 604 (Mooney). In addition, the administrative record indicates that Spurlino often commented that the

company's detailed records would show that there had been no discrimination in job assignments.  Spurlino has not provided this court, and it appears not to have provided the ALJ, with a comprehensive summary of those records that would corroborate its denials.  It is reasonable to draw an adverse inference from that silence with respect to the company's own records.

The volume of concrete needed at the stadium project increased to the point that Spurlino was required to assign more and more drivers to the project until even Eversole was dispatched to the stadium project on some occasions.  He was dispatched for the first time on March 16, 2006.  Although Eversole, Stevenson, and Bales all were eventually assigned to do some work at the stadium project, all three had far fewer of these premium hours than would have been expected if Spurlino had continued its ordinary job assignment practices, based on seniority for the first assignments of the day and first-back, first-out for later assignments in the day.

The union requested that Spurlino dispatch drivers to the stadium project by seniority, according to the call list, and as the union contends was required by the PLA.  Spurlino replied at first that it was unaware of any deviation from its usual dispatching system and that, in any case, it believed that the PLA did not apply to dispatches that were made from the Indianapolis facility because it was not on the construction site.

As the stadium project required higher volumes of concrete, Spurlino decided in May 2006 to build a portable concrete plant at the stadium property. The Board's general counsel has offered substantial evidence that Spurlino told the union representatives that the union would not represent employees working at the portable plant.

The portable plant began operating in June 2006.  The portable plant was dedicated to providing concrete for only the stadium project.  It operated only when the stadium project had large daily demands for concrete.  The portable plant remained in operation until February 2007, when it was dismantled.

Because the portable plant was a highly desirable work assignment, the method of selecting employees who would work there was important.  Spurlino sought volunteers for the work.  The selection, Spurlino managers said, would be based on "skills, qualifications, and past performance."  Seniority would be used only to distinguish between two equally qualified candidates.  Spurlino told drivers who expressed interest that they would lose their seniority at the Kentucky Avenue facility if they transferred to the portable plant.  That information, which turned out to be false, effectively discouraged at least Eversole and Bales from seeking a position at the portable plant.  (After Spurlino closed the portable plant, it re-assigned the portable plant drivers to the Kentucky Avenue facility and fully restored their seniority at that facility.)

To determine who had the necessary "skills, qualifications, and past performance" to work at the portable plant, Spurlino administered a driving test. The test utilized a "rear-loader" truck, the type to be used at the portable plant. Rear-loader trucks have manual transmissions while the front-loader trucks that Spurlino's drivers usually use have automatic transmissions. The general counsel also offered substantial evidence that contradicted management's account of the bases for selecting portable plant drivers.

It is not surprising that testimony from the union leaders conflicted with management's testimony, but so did the testimony from drivers who were against the union or neutral. Terry Mooney refused to take the driving test and had no prior experience driving the rear-loading trucks that Spurlino wanted to use at the portable plant. He was still given one of the jobs. Tr. 609-10. Eric Kiefer had no experience with rear-loading trucks, and during the driving test he broke the brakes on the truck. He was still given one of the jobs. Tr. 480-83, 506. Union leader Gary Stevenson took the driving test and did well, Tr. 587-88, but was not offered the position, and the company has offered contradictory accounts of its reasons for not giving Stevenson one of the jobs. See Tr. 766-68. In short, substantial evidence weighs against the accuracy and honesty of the company's explanation for its choice of drivers for the preferred assignments.

Spurlino argues that the PLA provided it with "the right to hire whomever it pleased as truck drivers to perform work at the Stadium Project." Further,

Spurlino claims that the PLA provided that seniority would play no role in work to be performed by truck drivers working on the Stadium Project.  Spurlino points to Section 3.12 of the PLA, which stated in its entirety:  "Individual seniority will not be recognized or applied to employees working on the Project."  Joint Ex. 4, § 3.12 at 12.

Spurlino's position misinterprets the PLA.  The PLA provision barring individual seniority meant that there would be no effort to recognize seniority as between employees of different employers performing similar work on the stadium project.  One can only imagine how unmanageable the gigantic project would have been if individual seniority had to be recognized among different employers in the same trade.  But the many major unions whose members worked on the stadium were not giving up all employees' internal seniority rights for work on the project, so that individual employers would be able to manipulate assignments in ways similar to Spurlino's approach.  Other provisions of the PLA make clear that unless there was a specific conflict between the PLA and any existing collective bargaining agreements, those existing agreements would remain in effect.  Joint Ex. 4, § 2.3 at 5.  The PLA did not require Spurlino to modify its job assignment procedures, but neither did the PLA give Spurlino any new authority to modify its job assignment procedures.  (Spurlino has adamantly insisted both that it did not actually modify its job assignment procedures and that the PLA authorized and/or required it to modify them.)

-18-

On June 7, 2006, Spurlino announced that the portable plant drivers would be Mooney, Kiefer, Thomerson, and Penatello.  Thomerson and Penatello had worked for Spurlino less than two months before they were selected as portable plant drivers.

Penatello resigned in July 2006.  Management asked union leaders Eversole and Bales if they wanted to replace Penatello as a driver at the portable plant. Both declined the position when management told them that they would lose their seniority status on the Kentucky Avenue call list, though this information turned out to be false, as noted.  Other drivers who were not active union leaders, however, were given offers to be "alternate/back up" drivers at the portable plant who would be allowed to keep their places on the Kentucky Avenue call list. Spurlino selected one driver to replace Penatello and three others to be alternate/back up drivers.  One of the alternate/back up drivers had been employed less than two months before being given the job at the portable plant. Union leaders Eversole and Bales were never offered the alternate/back up driver position, which they could have taken without jeopardizing their seniority at Kentucky Avenue.

As demand for high daily volumes of concrete dwindled at the stadium, Spurlino closed the portable plant in early February 2007.  The portable plant drivers then returned to Kentucky Avenue and regained their original seniority places on the call list.  At the time of the hearing on June 22, 2007, Spurlino

continued to dispatch drivers to the stadium project from its Kentucky Avenue facility for small pours.

Throughout the time that Spurlino was providing concrete for the football stadium, it was negotiating with the union over the terms of an initial contract. The evidence shows that throughout that period, Spurlino repeatedly made unilateral changes in terms and conditions of employment, without bargaining with the union. The subjects of these changes included the job assignments for the stadium project in general and the portable plant in particular, the effect of portable plant assignments on seniority, and a wage increase granted by Spurlino in a way designed to deny the union credit for any improvements.

The ALJ heard detailed evidence about the course of negotiations, which have been proceeding off and on for more than eighteen months now without a new contract and without a true impasse. The Board's general counsel offered evidence tending to show that the company is responsible for dragging out the bargaining without result as part of a strategy to undermine the union's credibility. The general counsel offered substantial evidence that Matney and other Spurlino managers had warned employees that the company would do exactly that if they voted for a union. The company presented evidence trying to shift the blame to the union, suggesting that the union was more interested in reaching an agreement with other concrete companies in the area before reaching an agreement with Spurlino.

Keeping in mind this court's limited role, for present purposes, the court finds that the weight of evidence tends to favor the Board's position on this question.   Eversole and Bales have no incentive to drag out the bargaining. Spurlino's conduct in making unilateral changes without bargaining over them, and the substantial evidence of a broader campaign to undermine the union by means both fair and foul, together persuade the court that Spurlino appears not to be bargaining in good faith.   See generally *Electro-Voice*, 83 F.3d at 1570 (considering totality of evidence in evaluating strength of Board's case).

The Board's ALJ conducted a hearing on the Union's unfair labor practice charges from April 24, 2007 to April 27, 2007, and recessed until July 10, 2007. On May 11, 2007, the Board's Regional Director filed this action under § 10(j) to obtain injunctive relief pending the final decision of the Board on the relevant unfair labor practice charges against Spurlino.   The ALJ then accelerated the conclusion of the administrative hearing and heard evidence on May 30 and 31, 2007.   This court conducted a hearing on June 22, 2007 to hear evidence on the need for injunctive relief beyond that presented at the administrative hearing.

The evidence presented to this court weighs in favor of granting injunctive relief.   Several drivers and union leaders testified credibly that attendance at union meetings for Spurlino employees has dropped to very low levels and that management's strategy of delay and harassment is having the intended effect of discouraging the drivers.   All are sick and tired of waiting for an agreement with

Spurlino. Some drivers have quit in disgust and disappointment, and most others are considering that option.[5] Neither the witnesses nor the court could say just when the company's conduct would finally break the union. But the evidence showed convincingly that the company is determined to achieve that result and that its conduct – including the unlawful retaliation against union leaders – is likely to lead to that result in the foreseeable future, with a significant chance that the result could be reached before the Board can take final and effective action on the pending unfair labor practice charges.

III.    *Likelihood of Success on the Merits*

The court's findings of fact show that the Director has made a strong showing that the Board is likely to succeed on the merits of the unfair labor practices charges. The court recognizes that it "has no jurisdiction to pass on the merits of the underlying case before the Board," *Electro-Voice*, 83 F.3d at 1567, and that the district court's analysis "should not be taken as a finding in favor of the Director on the merits." *Id.* at 1570. At the same time, *Electro-Voice* and other cases require this court to evaluate on a preliminary basis the Director's likelihood of succeeding on the merits of these charges. This court considers the likelihood of success on the merits only for the purpose of deciding whether injunctive relief is warranted.

---

[5]The court overruled Spurlino's hearsay objections to testimony by one driver about other drivers' attitudes and plans. A declarant's statement about his own present state of mind, such as an employee's statement that he is unhappy and thinking of quitting, falls within the hearsay exception in Fed. R. Evid. 803(3).

Section 7 of the NLRA provides that employees "shall have the right to self organization . . . to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."  29 U.S.C. § 157.  Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights" guaranteed in section 7.  29 U.S.C. § 158(a)(1).  Section 8(a)(3) makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization. . . ."  29 U.S.C. § 158(a)(3).  Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees. . . ."  29 U.S.C. § 158(a)(5).

For the reasons discussed above in the findings of fact, the Director has made a strong showing of likelihood of success on the merits of the charge that Spurlino was retaliating against union leaders in a public way that tends to discourage and undermine support for the elected union.  The Director has also made a strong showing of likelihood of success on the merits of the charge that Spurlino was making unilateral changes in the terms and conditions of employment without bargaining over those issues.  The Director has also made at least a substantial showing that Spurlino has not been bargaining in good faith over the last eighteen months.

IV.    *Irreparable Harm, Adequacy of Remedy at Law, and Balance of Equities*

Turning to the other equitable issues affecting the Director's request for injunctive relief, this court heard the relevant evidence through live testimony. There is no issue at this stage of a standard of review or deference to the Director's view of the facts.[6]

The first question is whether the employees' union effort will suffer irreparable harm in the absence of an injunction.  See *Electro-Voice*, 83 F.3d at 1572.  The Director has come forward with substantial evidence that Spurlino's anti-union effort has already had chilling, discouraging effects on the employees' union effort.  Witnesses before this court testified credibly about the demoralizing effect of the company's punishment of union leaders, its unilateral changes in terms and conditions of employment, and the failure to reach an initial contract. This is not a case of "speculative" harm.  In this case, especially because the union is new and vulnerable to the tactics of Spurlino and its consultants, there is a substantial risk that Spurlino's unfair labor practices will inflict irreparable and possibly even fatal harm to the union before the Board can act.  See *id.* at 1573 (recognizing irreparable harm to union movement as time passes, and reversing and remanding for entry of injunctive relief); see also *Francisco Foods*,

_____

[6]The Director appears to have taken in this case the Seventh Circuit's advice in *Francisco Foods*, where the court expressed concern about another Regional Director's decision not to offer an independent case on irreparable harm beyond the merits evidence presented to the ALJ.  See 276 F.3d at 297 (finding that evidence on merits was nevertheless strong enough to make denial of injunctive relief under § 10(j) an abuse of discretion).

276 F.3d at 298-99 (recognizing special vulnerability of union in transition from one employer to a successor).

Spurlino argues that there is an adequate remedy at law in the form of a later award of back-pay to union leaders who were deprived of their fair opportunities to work the premium hours on the stadium project. The court rejects the argument. The actual dollars involved are relatively modest; the issue has been important to both the company and the union and its members because of the symbolic effect of the company's actions. The company has been punishing and undermining the union leaders in violation of the National Labor Relations Act. Its ability to do so with impunity thus far demoralizes and undermines this new and vulnerable union. The damage to the union's strength cannot be repaired with awards of a few hundred or even a few thousand dollars each to union leaders a year or more from now.

The balance of equities also favors issuance of injunctive relief here. The court has described in detail the strength of the Board's case against Spurlino. On the opposite side, Spurlino has not shown that it would suffer any unfair prejudice if the court grants injunctive relief that requires no more than compliance with the law. In light of Spurlino's track record to this point, it makes sense to back up those requirements with the ability of the court to enforce the injunction swiftly through contempt powers. Spurlino will not be harmed unfairly by requiring it to obey the law.

Spurlino argues that injunctive relief is not needed here because the stadium project is nearly complete and the portable plant has been dismantled. The argument misses the point.  Spurlino continues to make daily and weekly decisions about work assignments, terms and conditions of employment, and its approach to bargaining with the union.  The Board has made a strong showing that for more than a year, Spurlino has been systematically and deliberately violating federal labor laws in its approach to all of those matters.  On this record, there is every reason to expect it to continue to do so.  Even after the stadium project is done, Spurlino has new opportunities to continue this pattern of violations every day and every week with other customers and other work issues. Injunctive relief is still needed.  Even after the knife is withdrawn, the bleeding wound still needs bandaging.[7]

V.    *The Public Interest*

The public interest is furthered in part by ensuring that "an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Electro-Voice*, 83 F.3d at 1574 (quoting *Miller v. California Pacific Medical Center*, 19 F.3d 449, 460 (9th Cir. 1994)).  The Director has come

_____

[7]See *Gottfried v. Frankel*, 818 F.2d 485, 496 (6th Cir. 1987) ("We have previously rejected the argument that unfair labor practices must be ongoing to justify a grant of injunctive relief, since the prior activities could have lingering effects on union activity.").  In this case, the Director has presented substantial evidence both that the unfair labor practices have had lingering effects and that the practices themselves are continuing.

forward with evidence in this case that Spurlino has engaged in unfair labor practices and that there is a substantial risk that those practices will achieve their unlawful goal without injunctive relief.   There is no reason to believe that injunctive relief would have any public cost.  "The public interest is harmed when the Board's remedial powers under the NLRA lose their effectiveness with the passage of time."  *Lineback v. Printpack, Inc.*, 979 F. Supp. 831, 847 (S.D. Ind. 1997) (granting relief under § 10(j)).  The public interest favors injunctive relief in this case.

VI.   *The Scope of Injunctive Relief*

Accordingly, the Director has shown that injunctive relief under Section 10(j) is "just and proper" in this case.   The court is issuing an injunction prohibiting Spurlino from:  (1) retaliating against union leaders and members, through discriminatory job assignments or otherwise; (2) acting unilaterally to change terms and conditions of employment for those in the bargaining unit; (3) failing and refusing to bargain in good faith with the union; and (4) in any like manner interfering with, restraining, or coercing employees' exercise of their rights under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, pending final resolution of the unfair labor practice charges.

The first element is necessary and appropriate to address Spurlino's most visible and specific practice in manipulating job assignments to punish union

leaders and other forms of retaliation. Spurlino has shown its willingness to violate the law in this way, and the injunctive relief must include other methods of violating the prohibition on retaliation.

The second element on unilateral changes also addresses a well-established pattern of conduct. The union won the election. Even though Spurlino's management and consultants were angered and appalled by the outcome, federal law makes the union chosen by the majority vote the representative of the workers. Spurlino must bargain with the union rather than make unilateral changes to the workplace. Injunctive relief on this score is clearly needed.

The third element adds the closely related requirement that Spurlino bargain in good faith with the union over the terms of a new contract. This step is also important to remedy the company's long strategy of delay and obstruction of the union's ability to represent its members effectively.

The fourth element is a broader prohibition that is appropriate and necessary at this point in light of the company's determined, long-term, and apparently illegal campaign to kill off this union movement in its infancy.

An appropriate injunction is being entered effective immediately.

So ordered.

Date: November 8, 2007

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Robert J. Brown
THOMPSON HINE LLP
bob.brown@thompsonhine.com

Neil E. Gath
FILLENWARTH DENNERLINE GROTH & TOWE
ngath@fdgtlaborlaw.com

Geoffrey S. Lohman
FILLENWARTH DENNERLINE GROTH & TOWE
glohman@fdgtlaborlaw.com

Joanne Catherine Mages
NATIONAL LABOR RELATIONS BOARD
joanne.mages@nlrb.gov

Gladys Rebekah Ramirez
NATIONAL LABOR RELATOINS BOARD
rebekah.ramirez@nlrb.gov